AARON E. DE LEEST, #216832
adeleest@marshackhays.com
DEVAN DE LOS REYES, #335913
ddelosreyes@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Debtor and Debtor-in-Possession,
HERMS LUMBER SALES, INC.

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>HERMS LUMBER SALES, INC.,<br><br>Debtor and Debtor-in-Possession. | Case No. 8:25-bk-10403-SC<br><br>Chapter 11<br><br>MOTION TO APPROVE COMPROMISE WITH KALAMATA CAPITAL GROUP LLC; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MARK HERMS AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT<br><br>[NO HEARING REQUIRED UNDER LBR 9013-1(o)] |

TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY COURT JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

Debtor and Debtor-in-Possession, Herms Lumber Sales, Inc. ("Debtor") respectfully submits this motion to approve the compromise with Kalamata Capital Group LLC ("Motion"). A true and correct copy of the settlement agreement ("Settlement Agreement") between Kalamata Capital Group LLC ("Kalamata"), the Debtor, and Mark Herms is attached to the Declaration of Mark Herms ("Herms Decl.") as **Exhibit "1."**

/ / /

/ / /

## 1. Summary of Argument

Under Federal Rule of Bankruptcy Procedure ("FRBP") 9019, the court may approve a compromise or settlement on motion by the trustee. It is well-established that a compromise should be approved if it is "in the best interest of the estate . . . and is fair and equitable for the creditors." To determine the fairness, reasonableness and adequacy of a proposed settlement agreement, the court considers the *A&C Properties* factors: (1) the probability of success of the litigation; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

In this case, all four factors weigh in favor of granting the Motion and approving the Agreement. While the Debtor believes that it holds strong claims against Kalamata for unfair and deceptive trade practices, there is an aspect of uncertainty with litigation. Even if the Debtor prevails in litigation against Kalamata, there also may be difficulties in collecting a judgment against Kalamata. Moreover, if the Settlement Agreement is not approved, the Debtor will need to proceed with litigation against Kalamata, which is costly and time-consuming.

In contrast, the Settlement Agreement reduces the Debtor and the estate's liability to Kalamata by $99,272, or 76.79%. It is in the paramount interests of creditors for this liability to be reduced without further litigation, providing for a definitive resolution of the dispute between the Parties. Thus, the Debtor respectfully requests that the Court grant the Motion and approve the Settlement Agreement.

## 2. Statement of Facts

### A. The MCA Agreements

Prior to the Petition Date (defined below), the Debtor entered a certain revenue purchase agreement with Kalamata dated December 3, 2024 (the "MCA Agreement")[1]. *See* Herms Decl., ¶7; *see also* Ex. 2. Under the MCA Agreement, the Debtor agreed to pay Kalamata a total purchase price

[1] A true and correct copy of the MCA Agreement is attached to the Herms Decl. as **Exhibit "2."**

of $126,000.00 and a purchased amount of $171,990.00. *See* Ex. 2. In addition, the Debtor's principal, Mark Herms, personally guaranteed the MCA Agreement. *Id*.

On September 30, 2024, Kalamata caused a UCC-1 Financing Statement, Filing No. U240076267228[2] to be filed and asserted that its collateral included "[a]ll Accounts, Chattel Paper, Documents, Equipment, General Intangibles, Instruments and Inventory, now or hereafter owned or acquired, and all products and Proceeds thereof, in each case as such term is defined in Article 9 of the Uniform Commercial Code." *See* Request for Judicial Notice ("RJN"), Ex. 3.

Unfortunately, the Debtor was unable to continue to making payments to Kalamata due to the high weekly payment amount. *See* Herms Decl., ¶8.

### B. Bankruptcy Proceedings

On February 19, 2025 ("Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, initiating bankruptcy case no. 8:25-bk-10403-SC ("Bankruptcy Case"). *See* RJN, ¶1. The Debtor is operating as a debtor-in-possession. *Id*.

On or about June 29, 2026, the Bankruptcy Court approved Debtor's First Amended Chapter 11 Plan of Reorganization ("Plan") whereby Kalamata is treated as an unsecured creditor in the scheduled claim amount of $129,272.00 and where Debtor would pay Kalamata the allowed amount of its claim under the MCA Agreement in quarterly installments at 4.20% interest over five years.

Notwithstanding, the Debtor disputes the total scheduled amount of Kalamata's claim which it seeks to resolve in the Settlement Agreement.

### C. Summary of Key Settlement Terms

As set forth in the Settlement Agreement, the parties agree that, within five (5) days of entry of an order by the Bankruptcy Court granting this Motion and approving the Settlement Agreement, which order shall be final and non-appealable, the Debtor shall pay Kalamata $30,000.00 ("Settlement Amount") in full and final satisfaction of any and all claims that Kalamata has against the Debtor and Mark Herms, including any claim and distribution under the Plan. *See* Herms Decl., Ex. 1, pg. 1, § 3(a). In exchange, the parties will engage in mutual releases of liability. *Id*. at pgs. 2-

---

[2] A true and correct copy of the UCC-1 Filing Statement is attached to the RJN as **Exhibit "3."**

3, § 7. As part of the Settlement Agreement, Kalamata agreed to waive all claims against the Debtor's estate, whether priority, secured, or unsecured, including under the Plan. *Id.* at pg. 2, § 4.

## 3. Legal Argument

### A. Approval of the Agreement is in the best interest of the Estate.

Under Rule 9019, the Court may approve a compromise or settlement on motion by the trustee. Fed. R. Bankr. P. 9019. In addition, under 11 U.S.C. § 1107, the Debtor, as the debtor-in-possession, has the rights, powers, and duties of a trustee. *See* 11 U.S.C. § 1107. It is well-established that a compromise should be approved if it is "in the best interest of the estate . . . and is fair and equitable for the creditors." *Schmitt v. Ulrich (In re Schmitt)*, 215 B.R. 417, 424 (B.A.P. 9th Cir. 1997); *ATKN Company v. Guy F. Atkinson Company of California (In re Guy F. Atkinson Company)*, 242 B.R 497, 502 (B.A.P. 9th Cir. 1999) ("At its base, the approval of a settlement turns on the question of whether the compromise is in the best interest of the estate"). "In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider:

1) the probability of success of the litigation;
2) the difficulties, if any, to be encountered in the matter of collection;
3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and]
4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

*In re A & C Properties*, 784 F.2d 1377, 1380-81 (9th Cir. 1986); *United States v. Edwards*, 595 F.3d 1004, 1012 (9th Cir. 2010) (same). "[W]hile a court generally gives deference to a trustee's business judgment in deciding whether to settle a matter, the trustee 'has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved.'" *Goodwin v. Mickey Thompson Entertainment Group, Inc. (In re Mickey Thompson Entertainment Group, Inc.)*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003) (quoting *A&C Properties*, 784 F.2d at 1381).

In this case, all four of the *A&C* factors weigh in favor of approving the Settlement Agreement, as further detailed below.

### i. Probability of Success

In this case, the Debtor contests the amount due to Kalamata under the MCA Agreement and asserts that the agreement is a disguised predatory high-interest rate loan. *See* Herms Decl., ¶11. The Federal Deposit Insurance Corporation ("FDIC") has stated that "predatory lending" involves at least one of the following elements: (1) making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation; (2) inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced; or (3) engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting and unsophisticated borrower.

It is the Debtor's position that each of these elements are at play as it relates to the MCA Agreement. As such, the Debtor maintains that it holds claims against Kalamata, including, but not limited to, unfair and deceptive trade practices, breach of the implied covenant of good faith and fair deadline, unlawful contract, fraudulent representation, and money had, money received. *See* Herms Decl., ¶10. However, litigation over this matter would be costly and expensive. Section 4.5 of the MCA Agreement provides that New York law shall govern the agreements. *See* Ex. 2. Furthermore, Section 4.5 of the MCA Agreements provide that "[a]ny suit, action, or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Purchaser so elects, be instituted in any court sitting in New York..." *Id*. The Debtor anticipates that a significant amount of litigation would be around the venue and choice of law. The outcome of such procedural matters is uncertain.

While the Debtor is confident in the merit of its claims against Kalamata, there is an aspect of uncertainty with litigation. *See* Herms Decl., ¶11. Moreover, the Settlement Agreement reduces the amount that the Debtor and Mark Herms are obligated to pay Kalamata under the MCA Agreements. The Settlement Agreement reduces the Debtor's liability from the remaining $129,272, as stated as the scheduled claim amount, to only $30,000.00. This reduces the Debtor's remaining liability on account of the MCA Agreement by $99,272.00, or 76.79%. This substantial reduction in liability evidences the high likelihood of success. Thus, this factor weighs in favor of granting the Motion.

### ii. Difficulties in Collection

The potential difficulties in collection weigh in favor of approving the Agreement. Here, the Debtor seeks court approval of the Settlement Agreement, which will require it to pay Kalamata the Settlement Amount as set forth in the Settlement Agreement. *See* Herms Decl., ¶12. As a result, the Debtor is not collecting any funds from Kalamata but, instead, is attempting to reduce its liability to Kalamata. *Id*. Kalamata is also waiving all its claims against the Debtor's estate and terminating the UCC-1 financing statement as part of the Settlement Agreement. *Id*.

However, if the Settlement Agreement is not approved and the Debtor proceeds with litigation against Kalamata and is successful, it is unclear whether the Debtor will be able to enforce the judgment against Kalamata. *See* Herms Decl., ¶13. The Debtor has no information regarding Kalamata's current financial condition, assets, and creditors. *Id*. Prior to entry of judgment, the Debtor will have great difficulty obtaining Kalamata's financial information to determine to what extent a judgment may be payable. *Id*. Thus, this factor weighs in favor of granting the Motion and approving the Agreement.

### iii. Complexity and expense, inconvenience, or delay occasioned thereby

If the Settlement Agreement is not approved, then the Debtor will be forced to proceed with litigation against Kalamata. *See* Herms Decl., ¶14. To prove the claims against Kalamata, the Debtor will need to present evidence to show by a preponderance of the evidence that the MCA Agreement is a predatory, high-interest loan. *Id*. The Debtor anticipates that there will be substantial costs and expenses associated with proceeding to trial on these claims. *Id*. In contrast, the Settlement Agreement reduces the Debtor and the estate's remaining liability to Kalamata by $99,272.00, or 76.79%. *Id*. While the dispute between Kalamata and the Debtor is not overly complex, it will certainly be more expensive and inconvenient for the Debtor to contest the MCA Agreement and defend itself against Kalamata's future collection efforts if it is unsuccessful. *Id*., ¶15. Moreover, the Settlement Agreement provides finality to the dispute between Kalamata and the Debtor, avoiding any delay in the ultimate determination of the Debtor's liability to Kalamata. *Id.* Thus, this factor weighs heavily in favor of granting the Motion and approving the Agreement.

### iv. Paramount interest of creditors

But for the Settlement Agreement, the Debtor and the estate would need to assert claims against Kalamata for predatory, high-interest lending. *See* Herms Decl., ¶16. If unsuccessful, the Debtor would remain liable for at least $129,272.00 to Kalamata pursuant to the Kalamata's scheduled claim amount. *Id*. Simply put, the Settlement Agreement is in the paramount interests of creditors because it reduces the amount of funds that the Debtor owes Kalamata and provides for a definitive resolution of the dispute between the Parties. *Id*., ¶17. Thus, this factor weighs heavily in favor of granting the Motion and approving the Agreement.

In summary, all four of the *A&C* factors weigh in favor of approving the Agreement. As such, the Debtor respectfully requests that this Court grant the Motion in its entirety and approve the Agreement because it is in the best interest of the estate and creditors.

## 4. Conclusion

Based on the foregoing, the Debtor respectfully requests that the Court enter an order:

1. Granting the Motion;
2. Approving the Settlement Agreement attached as **Exhibit "1"** to the Herms Decl.;
3. Authorizing the Debtor to take all steps and execute any other documents necessary to effectuate the Settlement Agreement;
4. For such other relief as the Court deems just and proper.

DATED: September 4, 2026

MARSHACK HAYS WOOD LLP

By: */s/ Aaron E. de Leest*
AARON E. DE LEEST
DEVAN DE LOS REYES
Attorneys for Debtor and Debtor-in-Possession,
HERMS LUMBER SALES, INC.

## Declaration of Mark Herms

I, MARK HERMS, say and declare as follows:

1. I am an individual over 18 years of age and competent to make this Declaration.

2. If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3. The facts set forth below are true of my personal knowledge.

4. I am the President and CEO of Herms Lumber Sales, Inc., the Debtor and debtor-in-possession herein ("Debtor").

5. I make this declaration in support of the Debtor's Motion to Approve Compromise with Kalamata Capital Group LLC ("Motion").

6. All terms not defined herein are used as they are defined in the Motion.

7. Prior to the Petition Date (defined below), Debtor entered a certain revenue purchase agreement with Kalamata dated December 3, 2024 (the "MCA Agreement. Under the MCA Agreement, the Debtor agreed to pay Kalamata a total purchase price of $126,000.00 and a purchased amount of $171,990.00. See Ex. 2. In addition, I personally guaranteed the MCA Agreement.

8. Unfortunately, the Debtor was unable to continue to make the payments to Kalamata due to the high weekly payment amount that was due.

9. A true and correct copy of the fully executed Settlement Agreement between me, Kalamata and the Debtor, is attached here as **Exhibit "1."** I believe that the Settlement Agreement is a fair and reasonable settlement.

10. I believe that the Debtor contests the amount due to Kalamata under the MCA Agreement, as the agreement is a disguised predatory high-interest rate loan. I believe that the Debtor holds claims against Kalamata, including, but not limited to, unfair and deceptive trade practices, breach of the implied covenant of good faith and fair deadline, unlawful contract, fraudulent representation, and money had, money received.

11. While I am confident in the merit of the claims that the Debtor holds against Kalamata, there is an aspect of uncertainty with litigation. Moreover, the Settlement Agreement

reduces the amount that the Debtor and I are obligated to pay Kalamata under the MCA Agreement. The Settlement Agreement reduces the liability from the remaining $129,272.00 as stated in the schedules, to only $30,000. This reduces the Debtor's remaining liability on account of the MCA Agreements by $99,272.00, or 76.79%. This substantial reduction in liability evidences the high likelihood of success.

12. The potential difficulties in collection weigh in favor of approving the Agreement. Here, the Debtor seeks court approval of the Settlement Agreement, which will require it to pay Kalamata the Settlement Amount as set forth in the Settlement Agreement. As a result, the Debtor is not collecting any funds from Kalamata but, instead, is attempting to reduce its liability to Kalamata.

13. However, if the Debtor prevails in litigation with Kalamata, it is unclear whether the Debtor will be able to enforce the judgment against Kalamata. I have no information regarding Kalamata's current financial condition, assets, and creditors. Prior to entry of judgment, I am informed that I will have great difficulty obtaining Kalamata's financial information to determine to what extent a judgment may be payable.

14. If the Settlement Agreement is not approved, then the Debtor and I will be forced to proceed with litigation against Kalamata. To prove the claims against Kalamata, the Debtor and I will need to present evidence to show by a preponderance evidence that the MCA Agreement is a predatory, high-interest loan. I anticipate that there will be substantial costs and expenses associated with proceeding to trial on these claims. In contrast, the Settlement Agreement reduces the liability to Kalamata by $99,272.00, or 76.79%.

15. While the dispute between Kalamata and the Debtor is not overly complex, it will certainly be more expensive and inconvenient for me and the Debtor to contest the MCA Agreement and defend ourselves against Kalamata's future collection efforts if it is unsuccessful. Moreover, the Settlement Agreement provides finality to the dispute with Kalamata, avoiding any delay in the ultimate determination of the liability to Kalamata.

16. But for the Settlement Agreement, the Debtor and the estate would need to assert claims against Kalamata for predatory, high-interest lending. If unsuccessful, the Debtor and I would remain liable for at least $129,272.00, as set forth in the schedules.

17. I believe that the Settlement Agreement is in the best interests of the estate and creditors because it reduces the amount of funds that the Debtor and I owe Kalamata and provides for a definitive resolution of the dispute between the parties.

18. A true and correct copy of the MCA Agreement between me, Kalamata, and the Debtor is attached as **Exhibit "2."**

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 4, 2026.

MARK HERMS

## Request for Judicial Notice

Debtor and Debtor-in-Possession, Herms Lumber Sales, Inc. requests pursuant to Rule 201 of the Federal Rules of Evidence that this Court take judicial notice of the following:

1. On February 19, 2025, the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code, initiating bankruptcy case no. 8:25-bk-10403-SC ("Bankruptcy Case"). The Debtor is operating as a debtor-in-possession.

DATED: September 4, 2026

MARSHACK HAYS WOOD LLP

By: */s/ Aaron E. de Leest*
AARON E. DE LEEST
DEVAN N. DE LOS REYES
Attorneys for Debtor and Debtor-in-Possession,
HERMS LUMBER SALES, INC.

# EXHIBIT 1

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "**Agreement**") is dated September 2, 2026 and is made by and between Kalamata Capital Group LLC ("**Kalamata**"), Herms Lumber Sales, Inc. ("**Debtor**") and Mark Herms ("**Guarantor**"). These parties shall sometimes hereinafter be referred to collectively as the "Parties," or individually as a "Party."

WHEREAS, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on February 19, 2025, in the U.S. Bankruptcy Court, Central District of California, Santa Ana Division (the "**Bankruptcy Court**") under Case No. 8:25-bk-10403-SC (the "**Bankruptcy Case**").

WHEREAS, on or about December 3, 2024, the Parties entered into that certain Revenue Purchase Agreement (the "**MCA Agreement**") with a purchase price of $126.000.00 and a Purchased Amount of $171,990.00.

WHEREAS, on or about June 29, 2026, the Bankruptcy Court approved Debtor's First Amended Chapter 11 Plan of Reorganization ("Plan") whereby Kalamata is treated as an unsecured creditor in the scheduled claim amount of $129,272.00 and where Debtor would pay Kalamata the allowed amount of its claim under the MCA Agreement in quarterly installments at 4.20% interest over five years.

WHEREAS, the Parties, for good and valuable consideration, the sufficiency of which is hereby acknowledged, wish to settle the amounts owing under the MCA Agreement and payment of its claim under the Plan in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, based upon the mutual covenants and consideration expressed herein, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. **Authorization Approval of Settlement.** Within fourteen (14) days of signing this Agreement, Debtor shall submit a motion or cause a motion to be submitted to the Bankruptcy Court to approve this Agreement.

2. **Mutual Representations.** Each Party hereby agrees that this Agreement represents a fair and equitable compromise between the Parties.

3. **Settlement; Consideration.**

a. Payment. Within five (5) business days after entry of an order by the Bankruptcy Court approving this Agreement, which order shall be final and non-appealable, and, subject to the terms and conditions contained herein, Debtor shall pay Kalamata THIRTY THOUSAND ($30,000.00) (the "**Settlement Amount**") payable in one lump sum in full and final satisfaction of any and all claims that Kalamata has against the Debtor and Guarantor, including any claim and distribution under the Plan.

b. Payment Delivery. Debtor shall make payment by wire or electronic fund transfer to the following account:

Bank Name: Citibank

Bank Address: 1 Broadway New York NY 10005
Account Name: Berkovitch & Bouskila PLLC
Account Number: [redacted]4726
Routing Number: 021000089

4. **Waiver of Claims; Terminating Financing Statement.** Upon the Bankruptcy Court's approval and Kalamata's receipt of the Settlement Payment, Kalamata waives all claims against Debtor and Guarantor, including under the Plan. Kalamata shall also file a UCC-3 termination statement with the California Secretary of State reflecting that its UCC-1 financing statement is terminated.

5. **Breach/Default.** If Debtor fails to pay the Settlement Amount in accordance with the terms of this Agreement, Kalamata shall provide notice to Debtor and five (5) business days' opportunity to cure any such default. If Debtor fails to pay the Settlement Amount within such cure period, the Debtor shall be required to make all payments to Kalamata in accordance with the Plan.

6. **Representations and Warranties.** Each Party specifically and expressly warrants and represents to and for the benefit of the other:

a. that each Party signing this Agreement is authorized and has the right to surrender, compromise, settle, release, and cancel the claims, demands, choses in action, defenses, and causes of action covered by the terms of this Agreement and any part hereof;

b. that each Party signing this Agreement has made such investigation of the facts pertaining to this Agreement and all matters pertaining hereto as deemed necessary;

c. that each Party signing this Agreement, in executing this Agreement, does not rely on any inducements, promises, or representations of any other Party hereto, other than as specifically set forth in this Agreement; and

d. that each Party has had its own legal counsel review this Agreement prior to execution of the same, or, alternatively, has had full and fair opportunity for legal counsel to review the agreement and has affirmatively chosen instead to waive such right, as evidenced by this representation and the signature of such party below on this agreement.

7. **Mutual Release of Liability.**

a. Each Party, on behalf of itself and the Released Parties (as defined below), upon the full payment and receipt of the Settlement Amount, hereby release and forever discharge the other party, including its related or affiliated companies, principals, subsidiaries, guarantors, including Guarantor, and its present and former officers, directors, shareholders, members, managers, agents, employees, attorneys, successors, heirs and assigns (collectively, the "**Released Parties**") from and against all claims, rights, demands, actions, obligations, liabilities, and causes of actions, of any and every kind, nature, and character whatsoever, that each party may have now, may have had in the past, or may have in the future against the other party or the Released Parties based on any acts or omissions arising from, relating to, or in connection with the MCA Agreement

and Plan (the "**Released Claims**") to the fullest extent permitted by law.

b. Each Party understands and agrees that, upon payment and receipt of the Settlement Amount, this Agreement shall constitute full and final release covering all unknown and unanticipated injuries, debts, claims, or damages that may have arisen or may arise in connection with any act or omission by the Released Parties, including Guarantor, before the date of this Agreement. For that reason, each Party hereby waives any and all rights or benefits that each party may have under the terms of Cal. Civ. Code § 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

8. **No Admission of Liability**. Each Party acknowledges that this is a compromised settlement of doubtful and disputed claims, or potential disputed claims, and the furnishing of the Settlement Amount under this Agreement shall not be deemed or construed as an admission of liability or responsibility at any time for any purpose.

9. **Miscellaneous.**

a. Ambiguities. If there are any ambiguities between the terms of this Agreement and (i) any proposed or approved Plan or (ii) confirmation order of a Plan filed by Debtor, the terms and conditions of this Agreement shall control.

b. Cooperation. The Parties agree to execute and deliver such additional documents and instruments and to perform such additional acts as any Party may reasonably request or as may be reasonably necessary or appropriate to effectuate, consummate, or perform any of the terms, provisions, or conditions of this Agreement.

c. Entire Agreement. This Agreement constitutes the entire understanding between the Parties hereto with respect to the MCA Agreement and Plan and supersedes all negotiations, representations, prior discussions, and preliminary agreements between the Parties hereto, whether oral or written.

d. Interpretation. The captions and headings contained herein are for convenience of reference only and shall not be construed as substantive provisions of this Agreement. This Agreement shall be construed and interpreted as if drafted equally by all Parties hereto.

e. Governing Law. This Agreement will be governed by and construed in accordance with California law. The Parties hereby submit to the exclusive jurisdiction of the U.S. Bankruptcy Court, for the Central District of California, Santa Ana Division in any adversarial proceeding arising from, related to, or in connection with this Agreement, including any dispute arising under or in connection with the MCA Agreement and Plan. Each Party hereby

waives any defense for inconvenient forum. In the event of any dispute arising from this Agreement, the United States Bankruptcy Court for the Central District of California, Santa Ana Division shall be the exclusive forum to resolve such dispute.

f. Binding. This Agreement is for the benefit of and is binding upon the Parties and each of their respective successors, assigns, heirs, and personal representatives.

g. Counterparts. This Agreement may be executed in one or more counterparts, all of which when taken together shall constitute but one agreement.

h. Severability. Each of the provisions of this Agreement is independent of one another. Any provision of this Agreement found to be unenforceable shall be severed from the remaining terms and conditions, and the remainder of the terms and conditions shall be enforced to the full extent allowed in law or equity. Any unenforceable provision of this Agreement shall be re-written by the Court or other tribunal interpreting the same such that it is then enforceable and most closely approximates the intent of the Parties.

i. Modification. This Agreement may not be superseded, modified, waived, amended, or changed except by a written instrument signed by the Party to be charged with the modification, waiver, or amendment.

j. Waiver. No failure by any of the Parties to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement, or to exercise any right or remedy upon the breach thereof, shall constitute a waiver of any breach of this Agreement.

k. Representation of Authority to Enter into This Agreement; No Assignment. Each Party represents and warrants that it has the authority to enter into this Agreement and agree to the terms and conditions set forth herein. The Parties represent that neither has sold or assigned any of the claims or causes of action that they have against the other.

l. Attorney Fees. In any action to enforce or interpret the provisions of this Agreement, including, without limitation, the withdrawal of the Proof of Claim, the prevailing Party shall be entitled to collect its costs and expenses (including reasonable attorney fees).

[Signature Page to Follow]

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be signed as he date indicated in the introductory paragraph.

**KALAMATA CAPITAL GROUP, LLC**

By: Brandon Lakes

Its: Co-President

**HERMS LUMBER SALES, INC.**

By: Mark Herms

Its: President

Mark Herms
**Mark Herms**

# EXHIBIT 2

Docusign Envelope ID: 806066EC-7815-4FF1-A875-359A71EB3AF1

Black Olive CAPITAL

# TERMS AND CONDITIONS OF REVENUE PURCHASE AGREEMENT

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Seller Deposit Agreement and Processor**
Seller shall (A) execute an agreement acceptable to Purchaser with a Bank acceptable to Purchaser to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to Purchaser with the Processor, instructing the Processor to remit all Future Receipts to a deposit account designated by Purchaser. If Seller selects Processor Remittances as its primary Remittance Method, Seller shall have five (5) business days to ensure collections of Future Receipts and Remittances are being sent by Processor to Purchaser. Until the Purchased Amount and any costs, fees or charges hereunder have been received by Purchaser, Seller shall maintain ACH Remittances as a secondary Remittance Method. At any time and to the extent that Processor Remittances are not being received by Purchaser or otherwise fail, Purchaser has the ability, without notice to Seller, to rely on ACH Remittances to make ACH debits necessary to receive the amount of the Remittance agreed to herein. Seller shall provide Purchaser and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Seller's receivables, receipts, deposits and withdrawals into and from the Account. Seller hereby authorizes Purchaser and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to Purchaser for the receipts as specified herein and to pay such amounts to Purchaser. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Seller for these deposits, whether pre-approved by Purchaser or not. This additional authorization is not a waiver of Purchaser's entitlement to declare this Agreement breached by Seller as a result of its usage of an account which Purchaser did not first pre-approve in writing prior to Seller's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of Purchaser.

**1.2 No Fixed Term of Agreement**
This Agreement shall remain in full force and effect until the entire Purchased Amount and any costs, fees, or charges incurred are received by Purchaser as per the terms of this Agreement.

**1.3 Reconciliation**
Every two calendar weeks from the date on page 1 of this Agreement, Seller shall submit its bank statements and financial information to Purchaser, and Purchaser shall reconcile the amount due to Purchaser by either crediting or debiting the Account so that the total amount of Remittances equals the Purchased Percent multiplied by the Seller's collections of Future Receipts for the preceding two calendar weeks period. Purchaser retains the right to request additional documentation including but not limited to bank login or DecisionLogic access to view Seller's accounts. All such submissions shall be sent in writing to reconciliations@kalamatacapitalgroup.com. Seller shall have no right to a reconciliation if an Event of Default, or other breach of this Agreement, has occurred. Upon receipt of the appropriate information, Purchaser shall perform the reconciliation within 3 business days.

**1.4 Adjustments to the Remittance**
As long as an Event of Default, or other breach of this Agreement, has not occurred, and if Seller experiences a decrease in its Future Receipts, Seller may submit a request to Purchaser to decrease the Remittance in accordance with the procedures for reconciliation submission set forth in Section 1.3 hereof so the Remittance shall more closely reflect the Seller's Future Receipts multiplied by the Purchased Percent. Purchaser shall reconcile Remittance in accordance with Section 1.3.

**1.5 Financial Condition**
Seller and Guarantor(s) (as hereinafter defined and limited) authorize Purchaser and its agents to investigate their financial responsibility and history, and will provide to Purchaser any authorizations, bank or financial statements, tax returns, etc., as Purchaser deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. Purchaser is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6 Transactional History**
Seller shall authorize all of its banks, brokers and card processors to provide Purchaser with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Seller shall provide Purchaser with copies of any documents related to Seller's card processing activity or financial and banking affairs within five (5) calendar days after Purchaser's request.

**1.7 Indemnification**
Seller and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by Purchaser for monies owed to Purchaser from Seller and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by Seller.

**1.8 No Liability**
In no event will Purchaser be liable for any claims asserted by Seller or Guarantor(s) under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Seller and Guarantor(s). In the event these claims are nonetheless raised, Seller and Guarantor(s) will be jointly and severally liable for all of Purchaser's attorney's fees and expenses resulting therefrom.

**1.9 Third Party Beneficiaries**
The parties agree that Processor and Seller's bank are third party beneficiaries for the purposes of Sections 1.1, 1.5, 1.6, 1.7 and 2.5 of this Agreement notwithstanding the fact that Processor and such bank are not parties to this Agreement, Processor and the bank may rely upon such terms in any action. Except as provided herein, this Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**1.10 Sale of Receipts**
Seller and Purchaser agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from Purchaser to Seller. Seller agrees that the Purchase Price is in exchange for the Future Receipts pursuant to this Agreement, and that it equals the fair market value of such Future Receipts. Purchaser has purchased and shall own all the Future Receipts described in this Agreement up to the full Purchased Amount as the Future Receipts are created. Remittances made to Purchaser in respect of the Purchased Amount shall be conditioned upon Seller's sale of products and services, and the payment therefore by Seller's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event that it is found to be interest despite the parties specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that Purchaser has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Seller any interest received by Purchaser in excess of the maximum lawful rate, it being intended that Seller not pay or contract to pay, and that Purchaser not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Seller under applicable law. As a result, thereof, Seller knowingly and willingly waives the defense of usury in any action or proceeding.

**1.11 Power of Attorney**
Seller irrevocably appoints Purchaser as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Purchaser from Processor, or in the case of a violation by Seller of Section 1 or the occurrence of an Event of Default under Section 3

Black Olive CAPITAL

hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; (v) to contact Seller's banks and financial institutions using Seller and Guarantor(s) personal information to verify the existence of an account and obtain account balances; (vi) to file any claims or take any action or institute any proceeding which Purchaser may deem necessary for the collection of any of the undelivered Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to delivery of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by Seller.

**1.12 Interference with Receipts**

Seller agrees that it will not engage in or voluntarily permit the following actions and acknowledges that each of the following is an Event of Default: (a) Seller takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Seller's services and products, including but not limited to, direct deposit of any checks into a bank account without scanning into the Purchaser electronic check processor; (b) Seller changes its arrangements with Processor or its bank in any way that is adverse or unacceptable to Purchaser; (c) Seller changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Seller's check or deposit transactions to another processor; (d) Seller intentionally interrupts the operation of this business, transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of Purchaser, and (ii) the written agreement of Purchaser or its transferee to the assumption of all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Purchaser; (e) Seller takes any action, fails to take any action, or offers any incentive—economic or otherwise—to induce any customer(s) to pay for Seller's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Seller fails to provide Purchaser with copies of any documents related to Seller's card processing activity of financial and banking affairs within five calendar days after a request from Purchaser.

**These protections are in addition to any other remedies available to Purchaser at law, in equity or otherwise pursuant to this Agreement.**

**1.13 Protection of Information**

Seller and each person signing this Agreement on behalf of Seller and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes Purchaser to disclose information concerning Seller's and each Owner's and each Guarantor's credit standing (including credit bureau reports that Purchaser obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Seller and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against Purchaser or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Purchaser as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality**

Seller understands and agrees that the terms and conditions of the products and services offered by Purchaser, including this Agreement and any other Purchaser documents (collectively, "**Confidential Information**") are proprietary and confidential information of Purchaser. Accordingly, unless disclosure is required by law or court order, Seller shall not disclose Confidential Information of Purchaser to any person other than an attorney, accountant, financial advisor or employee of Seller who needs to know such information for the purpose of advising Seller ("**Advisor**"), provided such Advisor uses such information solely for the purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach hereof entitles Purchaser to not only damages and reasonable attorney's fees but also to both a temporary restraining order and a preliminary injunction without bond or security.

**1.15 Publicity**

Seller and each of Seller's Owners and all Guarantors hereto all hereby authorizes Purchaser to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 Trade Names**

Seller hereby acknowledges and agrees that Purchaser may be using trade names, "doing business as", or "d/b/a" names in connection with various matters relating to the transaction between Purchaser and Seller, including the filing of UCC-1 financing statements and other notices or filings.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Seller represents warrants and covenants that, as of this date and, unless expressly stated otherwise, during the course of this Agreement:

**2.1 Financial Condition and Financial Information**

Seller's and Guarantors' bank and financial statements, copies of which have been furnished to Purchaser, and future statements which will be furnished hereafter upon Purchaser's request, fairly represent the financial condition of Seller at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller and Guarantors have a continuing, affirmative obligation to advise Purchaser of any material adverse change in their financial condition, operation or ownership. Purchaser may request statements at any time during the performance of this Agreement and the Seller and Guarantors shall provide them to Purchaser within five business days after request from Purchaser. Seller's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals**

Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization**

Seller, Guarantor(s) and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Use of Funds**

Seller and Guarantor(s) agree that it shall use the Purchase Price for business purposes, that Seller is receiving the Purchase Price and selling Purchaser the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Seller's business and not for personal, family, or household purposes.

**2.5 Electronic Payment Processing Agreement**

Seller will not change Processor, add terminals or use other equipment to process credit and debit card payments, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Seller's obligations under this Agreement, without Purchaser's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location**

Seller will not conduct Seller's businesses under any name other than as disclosed to the Processor and Purchaser, nor shall Seller change any of its places of business without prior written consent by Purchaser.

**2.7 Daily Batch Out**

Seller will batch out receipts with Processor on a daily basis if applicable.

**2.8 Estoppel Certificate**

Seller will at every and all times, and from time to time, upon at least one (1) day's prior notice from Purchaser to Seller, execute, acknowledge and deliver to Purchaser and/or to any other person, firm or corporation specified by Purchaser, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy**

As of the date of this Agreement, Seller is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller further warrants that it does not

Docusign Envelope ID: 806066EC-7815-4FF1-A875-359A71EB3AF1

Black Olive CAPITAL

anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Unencumbered Receipts**
Seller has, and will have, good, complete, unencumbered and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Purchaser.

**2.11 Business Purpose**
Seller is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Seller is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.12 Defaults under Other Contracts**
Seller's execution of, and/or performance under this Agreement, will not cause or create an event of default by Seller under any contract with another person or entity.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default**
The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a) Seller or any Guarantor shall violate any term or covenant in this Agreement, its guaranty or any agreement with Processor;
(b) Any representation or warranty by Seller or Guarantor in this Agreement, or its guaranty, as applicable shall prove to have been incorrect, false or misleading in any material respect when made;
(c) The sending of notice of termination by Seller or verbally notifying Purchaser of its intent to breach this Agreement;
(d) Seller fails to give Purchaser 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance will not be honored by Seller's bank;
(e) Seller fails, within 2 business days of Purchaser's request, to supply all requested documentation and allow for daily and/or real time monitoring of the Account;
(f) Seller shall, or shall enter into any agreement to, transfer or sell, all or substantially all of its assets;
(g) Seller shall make or send notice of any intended bulk sale or transfer by Seller;
(h) Seller shall use multiple depository accounts without the prior written consent of Purchaser;
(i) Seller shall enter into any financing agreements with any other party including but not limited to loans, merchant cash advances, receivables financing, or any other agreement that will increase the total debt or remittances owed by Seller to any other party;
(j) Seller shall change the Account or Processor without the prior written consent of Purchaser;
(k) Seller's bank returns a code other than NSF preventing Purchaser from initiating ACH Remittances or collecting Future Receipts; or
(l) Seller shall default under any of the terms, covenants and conditions of any other agreement with Purchaser.

**3.2 Bankruptcy Not Default**
Notwithstanding any other provision of this Agreement, filing for bankruptcy, becoming insolvent, or winding up the Seller's business for financial reasons is not a breach of this Agreement or an Event of Default, so long as Seller complies with the other terms of this Agreement. These other terms include, for example, the continuing affirmative obligation to advise Purchaser of any material adverse change in Seller's financial condition, operation or ownership, as required by Section 2.1.

**3.3 Personal Guaranty**
Seller agrees and acknowledges that if an Event of Default occurs, Purchaser will enforce its rights against the Guarantor(s). Upon such Event of Default, said Guarantor(s) will be jointly and severally liable to Purchaser for all of Purchaser's losses and damages, in addition to all costs and expenses and legal fees associated with such enforcement.

**3.4 Remedies**
If any Event of Default occurs, Purchaser may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce Seller's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy and enforcing the Security Agreement contained herein. All rights, powers and remedies of Purchaser in connection with this Agreement may be exercised at any time by Purchaser after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity. Additionally, and in no way limiting any other available remedies, if any Event of Default occurs, immediately and with or without notice unless otherwise required by law:
(a) The full uncollected Purchased Amount becomes due and payable in full immediately, and all fees (including reasonable attorney's fees and costs of collection in the amount of 25% of the Purchased Amount then outstanding) due under this Agreement and the attached Security Agreement become due and payable in full immediately;
(b) Purchaser may enforce the provisions of the Guaranty of Performance against the Guarantor(s);
(c) Purchaser may enforce its security interest in the Collateral;
(d) Purchaser may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if Purchaser recovers a judgment against Seller, Seller shall be liable for all of Purchaser's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and costs of collection in the amount of 25% of the Purchased Amount then outstanding under this Agreement.
Upon breach of any provision in this Agreement, Purchaser may exercise its rights under the assignment of Lease without prior notice to Seller. Purchaser may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Purchaser.

**3.5 Costs**
Seller shall pay to Purchaser all reasonable costs associated with (a) an Event or Default, (b) breach by Seller of the representations, warranties or covenants in this Agreement and the enforcement thereof, and (c) the enforcement of Purchaser's remedies set forth in this Agreement, including but not limited to attorneys' fees and costs of collection in the amount of 25% of the Purchased Amount then outstanding under this Agreement.

**3.6 Required Notifications**
Seller is required to give Purchaser written notice within 24 hours of any filing under Title 11 of the United States Code. Seller is required to give Purchaser five business days' written notice prior to the closing of any sale of all or substantially all of the Seller's assets or stock.

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements**
No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Purchaser.

**4.2 Successors and Assigns**
Purchaser may assign, transfer or sell any or all its rights under this Agreement, or its right to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller. This Agreement shall be binding upon and inure to the benefit of Seller, Purchaser and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Purchaser which consent may be withheld in Purchaser's sole discretion.

**4.3 Notices**
All notices, requests, consents, demands and other communications hereunder shall be delivered by (1) certified mail, return receipt requested, or (2) email, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to Purchaser shall become effective only upon receipt by Purchaser. Notices to Seller shall become effective three days after mailing, or immediately if by email. Notices that the Account does not contain sufficient funds, however, must be made by email to the following address: customerservice@kalamatacapitalgroup.com.

Docusign Envelope ID: 806066EC-7815-4FF1-A875-359A71EB3AF1

Black Olive CAPITAL

**4.4 Waiver Remedies**
No failure on the part of Purchaser to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Governing Law, Venue and Jurisdiction**
This Agreement, Security Agreement and Guaranty of Performance, and any and all addendums, attachments, exhibits and other documents relating to this Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Purchaser so elects, be instituted in any court sitting in New York (the "**Acceptable Forums**"). Seller and Guarantor(s) agree that the Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. If such proceeding be initiated in any other forum, Seller and Guarantor(s) waive any right to oppose any motion or application made by Purchaser to transfer such proceeding to an Acceptable Forum.
**Seller and Guarantor(s) hereby agree to waive their right to service of process as prescribed by New York Civil Practice Law and Rules. Seller and Guarantor(s) further agree that the mailing by certified or registered mail, return receipt requested to the Mailing Address listed in this Agreement, of any process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

**4.6 Survival of Representation**
All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation**
All parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either party hereto as drafter.

**4.8 Severability**
In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement**
Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement, the Security Agreement and Guaranty hereto embody the entire agreement between Seller and Purchaser and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10 JURY TRIAL WAIVER**
THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER**
THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (a) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (b) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.12 Facsimile & Digital Acceptance**
Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

**SELLER:** HERMS LUMBER SALES, INC. **AND THE ENTITIES LISTED ON APPENDIX A**

**By:** MARK CHARLES HERMS (Print Name) — DocuSigned by: Mark Herms C95037A14241426... (Signature)

**Guarantor #1:** MARK CHARLES HERMS (Print Name) — DocuSigned by: Mark Herms C95037A1424... (Signature)

**By:** ______________ (Print Name) ______________ (Signature)

**Guarantor #2:** ______________ (Print Name) ______________ (Signature)

**Black Olive Capital LLC:** ______________ (Print Name) ______________ (Signature)

Black Olive CAPITAL

## SECURITY AGREEMENT AND GUARANTY

Business (Seller) Legal Name: HERMS LUMBER SALES, INC. Federal Tax ID (EIN): 33-0679344

Doing Business As: HERMS LUMBER SALES

Business Address: 2280 N. STATE COLLEGE BLVD City: FULLERTON State: CA Zip: 92831

## SECURITY AGREEMENT

### Security Interest

This Security Agreement ("**Security Agreement**") secures all Seller's obligations under the Revenue Purchase Agreement (the "**Agreement**"). This Security Agreement will constitute a security agreement under the Uniform Commercial Code. Seller and Guarantor(s) grant(s) to Purchaser a security interest in and lien upon all of their present and future: (a) accounts (the "**Accounts Collateral**"), chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "**UCC**"), now or hereafter owned or acquired by Seller and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC, (c) funds at any time in any of the Seller's and/or Guarantor(s)' deposit accounts, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any Future Receipts purchased by Purchaser (collectively, the "**Secured Assets**"). The security interest in Account Collateral and Future Receipts purchased by Purchaser shall be effective immediately. The security interest in Secured Assets other than Accounts Collateral shall be effective automatically upon the occurrence of an Event of Default. Seller agrees to provide other security to Purchaser upon request to secure Seller's obligations under this Security Agreement. Seller agrees that, if, after an Event of Default, there are insufficient funds in Seller's Account to cover Purchaser's rights under this Security Agreement, Purchaser is granted a further security interest in all of Seller's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of Purchaser's rights under the Agreement, this Security Agreement and any other agreements now existing or later entered into between Seller, Purchaser or an affiliate of Purchaser. Purchaser is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its rights hereunder.

This security interest may be exercised by Purchaser without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Purchaser shall have the right to notify Seller's account debtors at any time. Pursuant to Article 9 of the UCC, as amended from time to time, Purchaser has control over and may direct the disposition of the Secured Assets, without further consent of Seller. Seller hereby represents and warrants that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, Purchaser will have all rights afforded under the UCC, any other applicable law and in equity. Seller will obtain from Purchaser written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Seller and Guarantor(s) agree(s) that this is a contract of recoupment and Purchaser is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Seller and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by Purchaser. Seller and Guarantor(s) agree(s) to execute and deliver to Purchaser such instruments and documents Purchaser may reasonably request to perfect and confirm the lien, security interest and right of set-off set forth in this Security Agreement. Purchaser is authorized to execute all such instruments and documents in Seller's and Guarantor(s) name.

Seller and Guarantor(s) each acknowledge and agree that any security interest granted to Purchaser under any other agreement between Seller or Guarantor(s) and Purchaser (the "**Cross-Collateral**") will secure the obligations hereunder and under the Agreement. Seller and Guarantor(s) each agrees to execute any documents or take any action in connection with this Security Agreement as Purchaser deems necessary to perfect or maintain Purchaser's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Seller and Guarantor(s) each hereby authorizes Purchaser to file any financing statements deemed necessary by Purchaser to perfect or maintain Purchaser's security interest. Seller and Guarantor(s) shall be liable for, and Purchaser may charge and collect, all costs and expenses, including but not limited to attorney's fees and costs of collection in the amount of 25% of the Purchased Amount then outstanding under this Agreement, which may be incurred by Purchaser in protecting, preserving and enforcing Purchaser's security interest and rights.

### Negative Pledge

Seller and Guarantor(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable. In the event that Seller or Guarantor creates, incurs, assumes, or permits to exist any lien on or with respect to any of the Collateral or Cross-Collateral, or otherwise breaches the terms of this Negative Pledge, Purchaser shall have the right to add to the Purchased Amount, in its sole discretion, an amount equal to the lesser of 10% of the Purchased Amount or $7,500.

### Consent to Enter Premises and Assign Lease

Purchaser shall have the right to cure Seller's default in the payment of rent on the following terms. In the event Seller is served with papers in an action against Seller for nonpayment of rent or for summary eviction, Purchaser may execute its rights and remedies under the Assignment of Lease. Seller also agrees that Purchaser may enter into an agreement with Seller's landlord giving Purchaser the right: (a) to enter Seller's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Seller's lease to another qualified business capable of operating a business comparable to Seller's at such premises.

### Remedies

Upon any Event of Default, Purchaser may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations to Purchaser.

## GUARANTY OF PERFORMANCE

THIS GUARANTY OF PERFORMANCE IS INCORPORATED IN AND PART OF THE REVENUE PURCHASE AGREEMENT (THE "**AGREEMENT**"). **Guarantor(s) will not be personally liable under the Agreement unless an Event of Default occurs pursuant to the Agreement.** As an additional inducement for Purchaser to enter into the Agreement, the undersigned Guarantor(s) hereby provides Purchaser with this Guaranty. Each Guarantor shall be jointly and severally liable for all amounts owed to Purchaser upon an Event of Default. Guarantor(s) guarantee Seller's good faith, truthfulness and performance of all of the representations, warranties, and covenants made by Seller in the Agreement as each may be renewed, amended, extended or otherwise modified (the "**Guaranteed Obligations**"). Guarantor's obligations are due at the time of any breach by Seller of any representation, warranty, or covenant made by Seller in the Agreement.

Docusign Envelope ID: 806066EC-7815-4FF1-A875-359A71EB3AF1

Black Olive CAPITAL

## Guarantor Waivers

Upon an Event of Default, Purchaser may seek recovery from Guarantor(s) for all of Purchaser's losses and damages by enforcement of Purchaser's rights under the Agreement without first enforcement against Seller, any other guarantor, or any Collateral or Cross-Collateral Purchaser may hold pursuant to the Security Agreement or any other guaranty.

Purchaser does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Security Agreement if it is not notified of:
(i) Seller's failure to remit any amount required under the Agreement; (ii) any adverse change in Seller's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) Purchaser's acceptance of the Agreement; and (v) any renewal, extension or other modification of the Agreement or Seller's other obligations to Purchaser. In addition, Purchaser may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Purchaser; (ii) release Seller from its obligations to Purchaser; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Seller's other obligations to Purchaser under the Agreement and this Agreement are satisfied, Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, any other guarantor, or any collateral provided by Seller or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that Purchaser must return any amount paid by Seller or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations hereunder shall include that amount.

## Guarantor Acknowledgement

Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

THIS GUARANTY OF PERFORMANCE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARDS TO ANY APPLICABLE PRINCIPALS OF CONFLICTS OF LAW. ANY SUIT, ACTION OR PROCEEDING ARISING HEREUNDER, OR THE INTERPRETATION, PERFORMANCE OR BREACH HEREOF, SHALL, IF PURCHASER SO ELECTS, BE INSTITUTED IN ANY COURT SITTING IN NEW YORK, AND GUARANTOR AGREES THAT THE FORUM IS CONVENIENT, SUBMITS TO ITS JURISDICTION AND WAIVES ANY AND ALL OBJECTIONS TO JURISDICTION OR VENUE. IF SUCH PROCEEDING BE INITIATED IN ANY OTHER FORUM, GUARANTOR WAIVES ANY RIGHT TO OPPOSE ANY MOTION OR APPLICATION MADE BY PURCHASER TO TRANSFER SUCH PROCEEDING TO NEW YORK.

Seller and Guarantor acknowledge that they have read Section 4.5 of the Agreement in its entirety and understand that they will accept process of any summons and complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Security Agreement.

## APPENDIX A – ADDITIONAL PARTIES

**The following entities shall be additional parties in whose assets Seller has granted Purchaser a security interest under the Agreement:**

HERMS LUMBER SALES INC / HERMS LUMBER SALES INC. / HERMS LUMBER AND SHAVINGS / HERMS CONSTRUCTION & DESIGN / HERMS LUMBER

**SELLER:** HERMS LUMBER SALES, INC. **AND THE ENTITIES LISTED ON APPENDIX A**

**By:** MARK CHARLES HERMS (Print Name) DocuSigned by: [illegible] (Signature)

**By:** ____ (Print Name) ____ (Signature)

**SSN#** [redacted]7475

**SSN#** ____

**Guarantor #1:** MARK CHARLES HERMS (Print Name) DocuSigned by: [illegible] (Signature)

**Guarantor #2:** ____ (Print Name) ____ (Signature)

Docusign Envelope ID: 806066EC-7815-4FF1-A875-359A71EB3AF1

Black Olive CAPITAL

**APPENDIX B - FEE STRUCTURE:**

A. Underwriting Fee: $299.00 to cover underwriting and related expenses

B. Origination Fee: $0.00 to cover cost of Origination and ACH Setup

C. Technology / Platform Fee: $0.00

D. Lack of Notice of Insufficient Funds Fee: $ 35.00 (each)

E. Stacking Fee: The lesser of 10% of the Purchased Amount or $ 7,500.00

F. Rejected ACH / Blocked ACH / Default Fee: $ 2,500.00 - Applicable upon Event of Default created when (i) Seller's bank returns a code other than NSF preventing Purchaser from initiating any ACH Remittances or collecting Future Receipts, or (ii) Seller changes the Account or Processor without prior written consent of Purchaser.

G. Bank Change Fee: $ 50.00 - When Seller requires a change of the Account.

H. Wire Fee: Each Seller shall receive its funding electronically to its designated bank account and will be charged $ 50.00 for a Fed Wire or $ 0.00 for ACH.

**AGREED AND ACKNOWLEGED:**

**SELLER:** HERMS LUMBER SALES, INC. **AND THE ENTITIES LISTED ON APPENDIX A**

**By:** MARK CHARLES HERMS (Print Name) — DocuSigned by: Mark Herms C95037A14241420... (Signature)

**By:** ____________ (Print Name) ____________ (Signature)

Docusign Envelope ID: 806066EC-7815-4FF1-A875-359A71EB3AF1

Black Olive CAPITAL

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT REMITTANCES (ACH DEBITS)

**DEFINITIONS** (Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Agreement):

**Agreement:** The Revenue Purchase Agreement between Black Olive Capital LLC ("**Purchaser**") and Seller, dated as of: ______________

**Seller:** HERMS LUMBER SALES, INC.
(Business Legal Name)

**Federal Tax ID (EIN):** 33-0679344

**Designated Checking Account (Primary):**

**Bank Name:** CITY NATIONAL BANK **Name on Account:** HERMS LUMBER SALES INC

**Routing Number:** 122016066 **Account Number:** [redacted]3496

**In the amount of: $** 3,294.83 **(or) Estimated percentage of each Banking Deposit:** 1 **%**

**On the Following Day(s):** ______________

The Designated Checking Account above shall be referred to herein as "**Designated Checking Account**". By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Agreement. Seller should keep a copy of this important legal document for Seller's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS**
By signing below, Seller authorizes Purchaser to disburse the Purchase Price less the amount of any applicable fees upon Purchaser's approval by initiating ACH Credits to the Designated Checking Account, in the amounts and at the times specified in the Agreement.

**By signing below, Seller also authorizes Purchaser to collect amounts due from Seller under the Agreement, as modified from time to time, by initiating ACH Debits to the Designated Checking Account. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Purchaser to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the undelivered Purchased Amount plus any other fees and charges due to Purchaser from Seller under the terms of the Agreement**

If any date of Remittance falls on a weekend or holiday, Seller understands and agrees that the Remittance may be executed on the next business day. If an ACH Remittance is rejected by Seller's financial institution for any reason, Seller understands that Purchaser may, at its discretion, attempt to process the ACH Debit again as permitted under applicable ACH rules. Seller also authorizes Purchaser to initiate ACH entries to correct any erroneous payment transaction.

Purchaser is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA.

The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designated Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Seller:** HERMS LUMBER SALES, INC.
(Business Legal Name)

**Authorized Signer (#1):** MARK CHARLES HERMS (Print Name) — DocuSigned by: Mark Herms (Signature)

**Authorized Signer (#2):** ______________ (Print Name) ______________ (Signature)

Docusign Envelope ID: 806066EC-7815-4FF1-A875-359A71EB3AF1

Black Olive CAPITAL

**BACKUP AUTHORIZATION AGREEMENT FOR DIRECT REMITTANCES (ACH DEBITS)**

**Per the terms of the Agreement permitting changes in Remittance Frequency:**

**Backup Designated Checking Account (Primary):**

**Bank Name:** CITY NATIONAL BANK **Name on Account:** HERMS LUMBER SALES INC

**Routing Number:** 122016066 **Account Number:** [redacted]496

**In the amount of: $** 658.97 **(or) Estimated percentage of each Banking Deposit:** 1 **%**

**On the Following Day(s)** MONDAY - FRIDAY

**Backup Designated Checking Account (Secondary):**

**Bank Name:** ______ **Name on Account:** ______

**Routing Number:** ______ **Account Number:** ______

**In the amount of: $**______ **(or) Estimated percentage of each Banking Deposit:** 1 **%**

**On the Following Day(s)** MONDAY - FRIDAY

**Backup Designated Checking Account (Tertiary):**

**Bank Name:** ______ **Name on Account:** ______

**Routing Number:** ______ **Account Number:** ______

**In the amount of: $**______ **(or) Estimated percentage of each Banking Deposit:** 1 **%**

**On the Following Day(s)** MONDAY - FRIDAY

The Designated Checking Accounts above shall be referred to herein, individually and collectively, as "**Designated Checking Account**". By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Agreement. Seller should keep a copy of this important legal document for Seller's records.**

**By signing below, Seller authorizes Purchaser to collect amounts due from Seller under the Agreement, as modified from time to time, by initiating ACH Debits to the Designated Checking Account. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Purchaser to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the undelivered Purchased Amount plus any other fees and charges due to Purchaser from Seller under the terms of the Agreement**

If any date of Remittance falls on a weekend or holiday, Seller understands and agrees that the Remittance may be executed on the next business day. If an ACH Remittance is rejected by Seller's financial institution for any reason, Seller understands that Purchaser may, at its discretion, attempt to process the ACH Debit again as permitted under applicable ACH rules. Seller also authorizes Purchaser to initiate ACH entries to correct any erroneous payment transaction.

Purchaser is not responsible for any fees charged by Seller's bank as the result of debits initiated under this Authorization Agreement. The origination of ACH debits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA.

The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designated Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Seller:** HERMS LUMBER SALES, INC.
(Business Legal Name)

**Authorized Signer (#1):** MARK CHARLES HERMS (Print Name) — DocuSigned by: Mark Herms (Signature)

**Authorized Signer (#2):** ______ (Print Name) ______ (Signature)

Black Olive CAPITAL

Dear Seller,

Thank you for accepting an offer from **Black Olive Capital LLC.** We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step.

**Please provide information required for read-only access* to your business account.**

**Bank portal website:** ______________________

**Username:** ______________________

**Password:** ______________________

**Security Question 1:** ______________________

**Answer 1:** ______________________

**Security Question 2:** ______________________

**Answer 2:** ______________________

**Security Question 3:** ______________________

**Answer 3:** ______________________

Any other information necessary to access your account:

______________________

**Email Address:** mark@hermslumber.com **Phone Number:** [redacted]4451

**Email Address:** ______________________ **Phone Number:** ______________________

* Read only access can be easily arranged by calling your Bank, allowing our Underwriters to view account information without being able to transfer, debit or otherwise access funds.

Docusign Envelope ID: 806066EC-7815-4FF1-A875-359A71EB3AF1

Black Olive CAPITAL

## Early Delivery of Purchased Amount Addendum

Business Legal Name: HERMS LUMBER SALES, INC. Date: __________

DBA: HERMS LUMBER SALES

This addendum (the "Addendum") to the Revenue Purchase Agreement dated __________ in the Purchased Amount of $ 171,990.00 (the "Agreement") is hereby made between the parties as of the date set forth above. Capitalized terms used herein and not otherwise defined have the meanings assigned in the Agreement.

Notwithstanding the Purchased Amount set forth in the Agreement, the parties agree that if Seller remits any of the following Purchased Amounts within the corresponding calendar days from the date of the Agreement (less any Remittances that cleared before such date that amount is received), as set forth below, then Seller shall have been deemed to have fully complied with its obligation to deliver the Purchased Amount in accordance with the Agreement:

| Calendar Days After Date of the Agreement: | Deemed Purchased Amount to be Delivered: |
|---|---|
| 30 DAYS | $ 159,390.00 |
| 60 DAYS | $ 160,650.00 |
| 90 DAYS | $ 161,910.00 |
| | |
| | |
| | |
| | |

If Seller elects to remit any such deemed Purchased Amount above, then any Remittances that clear after the applicable date designated will be refunded to Seller. If (i) the full amount of any such deemed Purchased Amount is not remitted to Purchaser within such applicable date set forth above, or (ii) Seller refinances the Purchased Amount with another lender, financial institution, merchant cash advance company or other creditor, then this Addendum shall be null and void. There is no penalty for early delivery of the Purchased Amount.

**Authorized Signer (#1):** MARK CHARLES HERMS (Print Name) — DocuSigned by: Mark Herms (Signature)

**Authorized Signer (#2):** __________ (Print Name) __________ (Signature)

DocuSign

| Certificate Of Completion | | |
|---|---|---|
| Envelope Id: 806066EC78154FF1A875359A71EB3AF1 | | Status: Delivered |
| Subject: Funding Agreement - HERMS LUMBER SALES INC - CD2014263 | | |
| Source Envelope: | | |
| Document Pages: 15 | Signatures: 10 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 2 | KCG Updates |
| AutoNav: Enabled | | 7200 Wisconsin Ave |
| EnvelopeId Stamping: Enabled | | #500 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | Bethesda, MD 20814 |
| | | updates@kalamatacapitalgroup.com |
| | | IP Address: 96.250.44.246 |

| Record Tracking | | |
|---|---|---|
| Status: Original<br>9/30/2024 2:45:43 PM | Holder: KCG Updates<br>updates@kalamatacapitalgroup.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Mark Charles Herms<br>mark@hermslumber.com<br>President<br>Security Level: Email, Account Authentication (None), Authentication | DocuSigned by:<br>Mark Herms<br>C95037A14241426...<br>Signature Adoption: Drawn on Device<br>Using IP Address: 76.89.238.61 | Sent: 9/30/2024 3:32:09 PM<br>Viewed: 9/30/2024 3:38:49 PM<br>Signed: 9/30/2024 3:39:55 PM |

**Authentication Details**
ID Check:
Transaction: 31032398996855
Result: passed
Vendor ID: LexisNexis
Type: iAuth
Recipient Name Provided by: Recipient
Information Provided for ID Check: Address, SSN9, SSN4, DOB
Performed: 9/30/2024 3:38:39 PM

Question Details:
failed county.lived.single.real
passed corporate.association.real
passed corporate.association.fake
passed person.age.real
passed vehicle.historical.association.real
passed property.street.in.city.real

**Electronic Record and Signature Disclosure:**
Accepted: 9/30/2024 3:38:49 PM
ID: fc843f9d-c891-4ee5-86ac-40602ff82b7a

| | | |
|---|---|---|
| Courtney Downing<br>courtney.downing@kalamatacapitalgroup.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | Sent: 9/30/2024 3:39:57 PM<br>Viewed: 9/30/2024 3:41:38 PM |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|
| Amy Erlich<br>amy.erlich@kalamatacapitalgroup.com<br>ISO Rep<br>Kalamata Capital Group<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:** | | Sent: 9/30/2024 3:39:56 PM<br>Viewed: 9/30/2024 3:40:47 PM |

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|
| Not Offered via DocuSign | | |

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| ISO On File<br>info@sunrisebusinesscapital.com<br>manager<br>ADJCO CONSULTING GROUP INC.<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 9/30/2024 3:32:08 PM |
| Amy Erlich<br>amy.erlich@kalamatacapitalgroup.com<br>ISO Rep<br>Kalamata Capital Group<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 9/30/2024 3:32:08 PM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/30/2024 3:32:08 PM |
| Certified Delivered | Security Checked | 9/30/2024 3:41:38 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 5/18/2020 10:02:58 AM
Parties agreed to: Mark Charles Herms

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Kalamata Capital Group LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Kalamata Capital Group LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by phone call: (800) 200-4071
To contact us by email send messages to: customerservice@kalamatacapitalgroup.com

**To advise Kalamata Capital Group LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at customerservice@kalamatacapitalgroup.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Kalamata Capital Group LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to customerservice@kalamatacapitalgroup.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Kalamata Capital Group LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to customerservice@kalamatacapitalgroup.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Kalamata Capital Group LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Kalamata Capital Group LLC during the course of your relationship with Kalamata Capital Group LLC.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
870 Roosevelt, Irvine, CA 92620

A true and correct copy of the foregoing document entitled: **MOTION TO APPROVE COMPROMISE WITH KALAMATA CAPITAL GROUP LLC; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF MARK HERMS AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 4, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **September 4, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**DEBTOR**
HERMS LUMBER SALES, INC.
ATTN: OFFICER, A MANAGING OR GENERAL AGENT, OR TO ANY OTHER AGENT AUTHORIZED BY APPOINTMENT OR LAW TO RECEIVE SERVICE OF PROCESS
2280 N. STATE COLLEGE BLVD.
FULLERTON, CA 92831

**INTERESTED PARTY**
KALAMATA CAPITAL GROUP
C/O CSC - LAWYERS INCORPORATING SERVICE, REGISTERED AGENT
2710 GATEWAY OAKS DRIVE, SUITE 150N
SACRAMENTO, CA 95833

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 4, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**PRESIDING JUDGE'S COPY – VIA PERSONAL DELIVERY**
HONORABLE SCOTT C. CLARKSON
UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
RONALD REAGAN FEDERAL BUILDING AND COURTHOUSE
411 WEST FOURTH STREET, SUITE 5130 / COURTROOM 5C
SANTA ANA, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| September 4, 2026 | Laurel Dinkins | */s/ Laurel Dinkins* |
| Date | Printed Name | Signature |

1. **<u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**: CONTINUED:

- **ATTORNEY FOR CREDITOR AMERICAN EXPRESS NATIONAL BANK: Jonathan Arias** jarias@zwickerpc.com
- **ATTORNEY FOR DEBTOR HERMS LUMBER SALES, INC.: Aaron E. De Leest** adeleest@marshackhays.com, adeleest@marshackhays.com,alinares@ecf.courtdrive.com
- **ATTORNEY FOR DEBTOR HERMS LUMBER SALES, INC.: Sarah Rose Hasselberger** shasselberger@marshackhays.com, shasselberger@ecf.courtdrive.com;cbastida@marshackhays.com;alinares@ecf.courtdrive.com
- **ATTORNEY FOR CREDITOR RDM CAPITAL FUNDING, LLC DBA FINTAP: Meredith King** mking@fsl.law, ssanchez@fsl.law;jwilson@fsl.law
- **INTERESTED PARTY: Elan S Levey** elan.levey@usdoj.gov, usacac.tax@usdoj.gov;caseview.ecf@usdoj.gov;usacac.tax@usdoj.gov
- **INTERESTED PARTY COURTESY NEF: Anne C Manalili** anne.manalili@sba.gov
- **INTERESTED PARTY COURTESY NEF: Steven Jeffrey Mirsky** smirsky@mirskycorporateadvisors.com
- **INTERESTED PARTY: Kenneth Misken** Kenneth.M.Misken@usdoj.gov
- **ATTORNEY FOR DEBTOR HERMS LUMBER SALES, INC.: Laila Rais** lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;lbuchanan@marshackhays.com;alinares@ecf.courtdrive.com
- **U.S. TRUSTEE: United States Trustee (SA)** ustpregion16.sa.ecf@usdoj.gov